626 So.2d 467 (1993)
Anthony FREDERICK, et al., Plaintiffs-Appellants,
v.
WOMAN'S HOSPITAL OF ACADIANA, et al., Defendants-Appellants.
No. 93-187.
Court of Appeal of Louisiana, Third Circuit.
November 3, 1993.
*469 Lawrence N. Curtis, Lafayette, for Anthony Frederick etc.
Donald S. Zuber, Baton Rouge, for Woman's Hosp. of Acadiana, et al.
Marc W. Judice, Lafayette, for Michael Boos, M.D.
Before STOKER, DOUCET and SAUNDERS, JJ.
SAUNDERS, Judge.
This medical malpractice action was brought by plaintiffs-appellants, Anthony and Sherie Frederick, to recover damages for devastating personal injuries suffered by their minor daughter, Adrien Rene, prior to birth. The remaining defendants were Dr. Michael Boos, the obstetrician-gynecologist who attended Mrs. Frederick and delivered the child, and Women's and Children's Hospital, where the child was born.
Plaintiffs' claims were tried before a jury which returned a verdict absolving defendants of any liability for plaintiffs' damages. From that verdict and the district court's judgment in accordance therewith, plaintiffs perfected this timely devolutive appeal. For the reasons which follow, we affirm the conclusions reached by the lower court.

FACTS
The mother, Sherie Frederick, was originally a patient of two codefendant physicians, since dismissed, for her pregnancy with Adrien Rene Frederick. Sometime in the evening of December 20, 1985, the evening before she presented herself to the hospital, Mrs. Frederick noted some minor leakage of fluid. Evidently her water bag had burst. One day or more prior to that time, she had noted some unusual movement of her unborn child. Due to the leakage the evening before, Mrs. Frederick presented herself to the Women's and Children's Hospital at about 10:00 a.m. on December 21, 1985. Dr. Michael Boos was on call and attended Mrs. Frederick for her original physicians. After admitting Mrs. Frederick, her principal nurse applied an external fetal monitor to monitor the child's heartbeat. Mrs. Frederick was then moved to the labor and delivery area for observation. Dr. Boos first examined her approximately one half hour after her arrival at the hospital and followed up with additional testing twice over the next hour. With no progression in the pregnancy apparent, he ruptured Mrs. Frederick's membranes and noted thick meconium and amniotic fluid, then applied a scalp electrode *470 to the fetus, which showed an unfavorable beat to beat variability in the child's heartbeats. A routine Caesarian Section was decided upon rather than an emergency or "crash" one.
The baby, Adrien Rene Frederick, delivered at approximately 3:30 p.m. December 21, 1985, developed seizures and was diagnosed as having suffered from severe fetal maternal transfusion. The resultant transfusion of blood into the mother depleted the ability of Adrien's blood to carry oxygen to her brain, causing seizures and profound brain injuries.

ISSUES RAISED
Plaintiffs-appellants assign as principal error the trial judge's refusal in this case to limit cumulative expert testimony. They also assign as reversible error the trial judge's refusal to permit plaintiffs to admit into evidence a video tape of one of the defense witnesses teaching a course to claims adjusters and his failure to declare a mistrial after one of the defendants alluded to collateral source benefits available to plaintiffs. Finally, plaintiffs argue that the jury erred in finding no negligence on the part of defendants and in failing to award damages.
For their parts, defendants counter that the trial judge did not abuse his considerable discretion in his evidentiary rulings and, citing Rosell v. ESCO, 549 So.2d 840 (La.1989) and related authority, that neither judge nor jury committed manifest error in their factual determinations that young Adrien Rene's injuries arose independent of any negligence on the part of defendants.

CUMULATIVE TESTIMONY
The principal issue raised in this appeal revolves around the new Code of Evidence, specifically the application of articles 403 and 702, and the proper level of appellate review required of courts of appeal in cases where the trial judge does not make known the basis upon which he or she allows one party to introduce into evidence, over the objections of opposing counsel, the testimony of a significant number of expert witnesses as to one or more identical elements of the case.
We are, thus, asked to determine the point at which a parade of expert witnesses called by one party becomes counterproductive to the necessary twin goals of fairness and judicial economy. Such an inquiry necessarily leads to consideration of the Code of Evidence.
When to exclude expert testimony in a civil context on grounds of cumulation is apparently res nova among reported cases, at least since the Code of Evidence became effective January 1, 1989, pursuant to § 12 of Acts 1988, No. 515. The trial court did not articulate the precise basis for its conclusion permitting multiple experts to testify as to the standard of care practiced by physician Boos. Therefore, we are unable to offer the usual deference attributed to such findings. Bloxom v. Bloxom, 512 So.2d 839, 843 (La. 1987); Thompson v. Petrounited Terminals, Inc., 536 So.2d 504 (La.App. 1st Cir.1988), writs denied, 537 So.2d 212, 213 (La.1989).
The facts peculiar to the case sub judice provide us with an opportunity to address several criteria among many that may be considered in determining whether to permit multiple expert testimony as to an element of the case. At the outset, except to give it more tone and broaden its fourth inquiry to take into account practical considerations of judicial administration, we generally adopt our brethren's pronouncement on the subject concerning the intrinsic value of expert testimony found in Adams v. Chevron U.S.A., Inc., 589 So.2d 1219, 1223 (La.App. 4th Cir. 1991), writs denied, 592 So.2d 414, 415 (La. 1992):
"The United States Fifth Circuit Court of Appeal has recently interpreted F.R.E. 403, after which the Louisiana rules on expert testimony are patterned. Christophersen v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir.1991). The court delineated the following four inquiries for determining the admissibility of expert testimony: (1) whether the witness is qualified to express an expert opinion, (2) whether the facts upon which the expert relies are the same type as are relied upon by other experts in the field, (3) whether in reaching his conclusion the expert used well-founded methodology, and (4) assuming the expert's testimony *471 passes these tests, whether the testimony's potential for unfair prejudice substantially outweighs its probative value under the relevant rules. Id. We adopt those standards as appropriate for evaluating the admissibility of expert testimony under Louisiana law."
Plaintiffs having apparently conceded the first three Adams inquiries, our focus here is limited by appellants' assignments of error to the fourth Adams inquiry, which must be broadened in the present context to concern the cumulative nature of the expert testimony to which plaintiffs direct their objection. Article 403 of the Code of Evidence requires balancing the testimony's probative value against not only unfair prejudice, see Adams, supra, but against "considerations of undue delay or waste of time" as well.
The specific provisions of the Code of Evidence of primary concern here read as follows:
Art. 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
Art. 702. Testimony by experts
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Admitting cumulative expert testimony not excludable on other grounds requires its fulfilling three conditions. The first condition questions the relevance of the testimony to be elicited. The second seeks to ascertain that the fact finder will be aided by the testimony. The third, balancing the probative value of this testimony against substantial prejudice, confusion, or inefficiency, guards against undue removal of reason from the fact finding process, as well as waste. Want of any of the three is fatal to admission of an expert's unbridled testimony.
The first condition imposes only a minimal threshold since all relevant evidence is admissible in Louisiana except as otherwise provided by specific constitutional or legislative pronouncements, including the Code of Evidence. LSA-C.E. art. 402.
LSA-C.E. art. 401 reads as follows:
Art. 401. Definition of "relevant evidence"
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
The second condition applies only to expert testimony. Grounded in LSA-C.E. art. 702, it concerns whether the specialized knowledge elicited from the expert will assist the trier of fact to understand the evidence or to determine a fact in issue. The need to comply with this condition represents a significant departure from the law prior to enactment of the Code of Evidence, insofar as previously the inquiry was limited only to asking whether the evidence offered by the expert was "obtained only by means of special training or experience," not whether it would be of actual benefit to the fact finder. See LSA-C.E. art. 702, Comment (a) and 3 J. Weinstein and M. Berger, Weinstein's Evidence ¶ 702[02] (1981), which it cites. See also, e.g., Hunnicutt v. Kent, 434 So.2d 91, 94 (La.App. 5th Cir.1982), writ denied, 435 So.2d 442 (La.1983).
The third condition, mandated by LSA-C.E. art. 403, is applicable to all evidence, fact or expert, and permits exclusion of evidence whose probative value is substantially outweighed by certain dangers that threaten the validity of fact finding or by considerations of judicial economy. It assumes, in fact requires, that the examined evidence is relevant and probative. Judicial administration concerns aside, the chief purpose of this condition is to ensure that the evidence does not deny the fact finder the ability to reach a conclusion based on rational grounds.
*472 This is not merely of academic or hypothetical concern. Article 1, § 22, of the Louisiana Constitution guarantees every citizen, plaintiff or defendant, an adequate remedy by due process of law, administered without partiality or delay. Improperly applied, the Code of Evidence and its interpretive jurisprudence could conspire to undermine both the Louisiana Constitution and the very purposes for the Code's enactment, "to secure fairness and efficiency in administration of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." LSA-C.E. art. 102. For most citizens, the only day in court of consequence is the one spent at the trial court level because:
"It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable."
Rosell, supra, 549 So.2d at 844, and cites therein contained. "The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973).

Discretion Limited
Essentially the same concerns articulated for giving latitude to trial judges in their factual findings justify leaving largely to their discretion the admission of cumulative evidence, Gormley v. Grand Lodge of State of Louisiana, 503 So.2d 181 (La.App. 4th Cir.), writ denied, 506 So.2d 1227 (La. 1987); Varnell v. Service Merchandise Co., Inc., 613 So.2d 1042, 1044 (La.App. 3d Cir. 1993), and in giving them "great discretion" in deciding which witnesses are qualified as experts, the breadth and scope of expert testimony, and the probative value of expert testimony, Armstrong v. Lorino, 580 So.2d 528, 531 (La.App. 4th Cir.), writ denied, 584 So.2d 1166 (La.1991); Comment (d), LSA-C.E. art. 702 and Weinstein and Berger, supra, ¶ 702[02] (1981); 1 id. ¶ 104[03] (1982). (Broad, though not boundless, discretion is accorded the trial judge in his determinations as to whether expert testimony will be admissible.)
While trial courts are given wide latitude, however, the Constitution of Louisiana does not permit appellate tribunals to abdicate their responsibilities in reviewing all findings of the lower courts as to either fact or law. To the contrary, the Constitution of 1974 provides in Article 5, § 10(B):
"(B) Scope of Review. Except as limited to questions of law by this constitution, or as provided by law in the review of administrative agency determinations, appellate jurisdiction of a court of appeal extends to law and facts."
As a consequence, the jurisprudential rule of practice that a trial court's factual findings will not be upset absent manifest error is predicated upon there being evidence before the trier of fact which furnishes a reasonable factual basis for the trial court's finding. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); in accord, Rosell, supra; Canter, supra. The Code of Evidence provides trial courts with the evidentiary rules of the road and deserves especial care in its application, if for no other reason than denial of a litigant's evidentiary rights removes the foundation upon which the deference called for in Rosell, Arceneaux, Canter, Armstrong, Gormley and Varnell, supra, rests and can be grounds for reversal.
Applying these precepts to the present facts, we find no basis for finding that the trial judge abused his great discretion in admitting the cumulative expert testimony. Defendants offered the sworn testimony of two pediatric neurologists, physicians who specialize in treating medical diseases of children's nervous systems. The two attended different medical schools; one is now principally a hospital administrator, the other a private practitioner. The trial judge therefore was correct in permitting each to testify, as each one's testimony added dimensional *473 perspective to the testimony of the other, and the testimony was offered in behalf of different parties who could conceivably prove adverse to one another.
Similarly, the trial judge did not abuse his much discretion in permitting the testimony of three obstetrician-gynecologists in addition to the opinion of the Medical Review Panel. Each differed in background and speciality. One graduated from LSU medical school, is chief of OB/GYN at a Dallas hospital and specializes in fetal-maternal medicine, which includes caring for the mother and fetus in high risk pregnancies (i.e., those most likely to have complications). Another attended the University of Tennessee Medical School, is board certified in OB/GYN, surgery, and perinatology, and is an academic at the University of Mississippi Medical Center. This expert has followed closely the development of babies like Adrien after birth and can claim credit for a number of awards and published articles. The third OB/GYN called by defendants trained at the University of Oregon, chaired the Department of OB/GYN at Tulane Medical Center, co-authored a handbook on obstetrics and gynecology published in 1992, and has performed years of antenatal diagnosis and treatment of birth defects, in addition to contributing to two books and several articles pertaining to this subject.
Nor can we say that the probative value of the expert testimony provided by defendants was outweighed, let alone substantially outweighed, by any of the concerns articulated in LSA-C.E. art. 403. Plaintiffs were free to and did cross-examine opposing witnesses and present expert testimony supporting their case. Indeed, a greater danger to these proceedings could have arisen had the trial court denied defendants the ability to adduce the limited volume of expert testimony allowed in this case.
Neither we nor the legislature can issue broad guidelines for applicability in every case. As a general rule, however, it would be safe to say that a party has a fundamental right to elicit the medical expert testimony of one witness on any point of significance to resolution of the issues presented and probably a second witness as well, for added perspective. As to whether a third or subsequent expert should be permitted, a number of factors appear pertinent, among them: the background and testimonial nature of the witnesses; whether the trier of fact is a jury or judge[1]; whether either of the parties litigant is a pauper whose lack of means would otherwise result in a lack of due process; the amount in controversy; the costs in time and money which would attend inclusion of the cumulative testimony; and the express willingness of the party seeking to elicit the testimony to bear the costs of the experts, regardless of the case's eventual outcome. Obviously, these considerations are most likely to arise when, as here, a party timely objects to another's introduction of cumulative testimony under LSA-C.E. art. 403.
Because such decisions necessarily must be made on a case by case basis, we attempt here to fashion neither a hard and fast rule on the subject, nor an exhaustive list of factors which the trial judge, whose broad discretion is unaffected by this decision, may draw upon. Nevertheless, parties are occasionally justified in their concern that a well-heeled party can obtain its version of justice at the trial court simply by retaining an arsenal of "hired guns" to prove its case, particularly in the context of a jury trial, then rest on the Canter-Arceneaux-Rosell line of defense. Protections against such a travesty can be found in the Code of Evidence. A party might seek to limit the number of experts permitted to testify in jury trials, LSA-C.E. art. 403, a difficult maneuver least likely to achieve the end sought. The concerned litigant may wish to have the trial judge instruct the jury that it is not the number of experts, but the relevance, credibility and probative value of their testimony which is of primary concern.
*474 Another possibility would be to request under LSA-C.E. art. 706 that the trial court appoint an unbiased expert and disclose to the jury the expert's special court-appointed status. This underutilized provision enables litigants of modest means to have the court use its leverage to distinguish court-appointed neutral observers who are beyond reproach from "hired guns" retained by the highest bidder, reducing the perceived need and advantage of litigants to hire the most (and most expensive) experts to counter (or preempt) those that will (or might) be called by their opponents, thus offering parties to judicial proceedings greater assurance that findings of fact are indeed grounded on a reasonable factual basis.

MANIFEST ERROR
Plaintiffs also complain that the triers of fact erred in finding no negligence on the part of defendants and in refusing to award damages to plaintiffs, but our thorough review of the voluminous transcript does not support these assertions. We cannot say that the triers of fact were clearly wrong in determining, consistent with the opinions expressed by several witnesses, that young Adrien would have been no better off had she been delivered immediately upon arrival at the hospital. Plaintiffs' expert, Dr. Shelburne, concluded that a majority of the injury to young Adrien could have been prevented and, further, that the baby would have been better off had she been delivered even a half hour sooner. His testimony, however, differs with Dr. Fleischmann's testimony that it would be difficult to tell whether delivery a half hour or more sooner would have made any difference. Even though both concluded that young Adrien would have been better off had she been delivered just two to four hours sooner, this testimony was refuted by that of other witnesses, including some who actually treated Adrien after birth, who testified that the unfortunate child sustained her injuries days, or even weeks before birth. According to both Dr. Burris and Dr. Chalub, the young baby suffered seizures as evidenced from twitching, stiffening, and changes in breathing several days prior to birth, making young Adrien's personal injuries inevitable upon birth, when the maternal life support of the fetus was severed. For this reason, according to Dr. Chalub, it would have made no difference whether Adrien was born at 9:00 a.m. or at 3:30 p.m. on the day Mrs. Frederick arrived at the hospital.
The trier of fact apparently was unconvinced that Dr. Boos was negligent for failing to pursue any of the options suggested by plaintiffs' expert, Dr. Chevernak, because it concluded that the young fetus was injured before birth. In addition, after hearing all of the evidence, the jurors apparently determined that the initial symptoms of mother and child called for the more cautious approach chosen by Dr. Boos and the other medical care providers. Another expert produced by plaintiff, neonatologist Dr. Fleischmann, concluded that the failure of Dr. Boos to assess the situation sooner by rupturing the membrane and taking fluid was a deviation from the standard of care. The probative value of Dr. Fleischmann's testimony, however, was foreshadowed by his admission that he had not delivered a baby since 1968 and was never an OB/GYN.

OTHER ASSIGNED ERRORS

Exclusion of Videotape
Plaintiffs also complain of the trial judge's refusal to permit them to impeach defense expert, Dr. Morrison, by showing his bias. When plaintiffs sought to introduce isolated moments of his taped lectures to claims adjusters in 1984, defendants objected and expressed their concern that, unless the taped lectures were played in their entirety, Dr. Morrison's words might be misconstrued. The trial judge sustained defendants' objections and refused to permit playing several hours of tapes over plaintiffs' objection that the tapes would demonstrate Dr. Morrison's bias.
"The admissibility of a videotape is largely within the discretion of the trial judge. LaFleur v. John Deere Co., 491 So.2d 624, 632 (La.1986); United States Fidelity & Guaranty Co. v. Hi-Tower Concrete Pumping Service, 574 So.2d 424, 438 (La.App.2d Cir.), writs denied, 578 So.2d 136, 137 (La.1991); Ashley v. Nissan *475 Motor Corp., 321 So.2d 868, 872-873 (La. App. 1st Cir.), writ denied, 323 So.2d 478 (La.1975). Determination of the admissibility into evidence of videotapes must be done on a case-by-case basis depending on the individual facts and circumstances of each case. Douglas v. G.H.R. Energy Corp., 463 So.2d 5, 7 (La.App. 5th Cir. 1984). The trial court must consider whether the videotape accurately depicts what it purports to represent, whether it tends to establish a fact of the proponent's case, and whether it will aid the jury's understanding. Against those factors, the trial court must consider whether the videotape will unfairly prejudice or mislead the jury, confuse the issues, or cause undue delay. The trial court may exclude the evidence if the factors favoring admission are substantially outweighed by the factors against admission. Louisiana Code of Evidence articles 401-403; Hi-Tower, 574 So.2d at 438; Burk v. Illinois Central Gulf Railroad Co., 529 So.2d 515 (La.App. 1st Cir.), writ denied, 532 So.2d 179 (La. 1988)."
Malbrough v. Wallace, 594 So.2d 428, 431 (La.App. 1st Cir.1991), writ denied, 596 So.2d 196 (La.1992).
A careful review of the trial judge's reasons shows that he did not abuse his discretion. First, he concluded that the tape would take at least three hours for the jury to put it in the proper context, and this would be an undue waste of time. Second, even after reading the transcript several times, the trial judge concluded that the testimony, subject to different interpretations, might confuse the jury no matter how much videotape was played. Finally, the trial judge concluded that taken out of context, introduction of only excerpts from the taped lecture would result in unfair prejudice.

Collateral Source Benefits
Finally, plaintiffs complain that the hospital's wrongful introduction of collateral source benefits is alone grounds for reversal.
"Under the `collateral source' rule, a tort-feasor may not benefit, and an injured plaintiff's tort recovery may not be diminished, because of benefits received by the plaintiff from sources independent of the tort-feasor's procuration or contribution. This rule has been applied to hold that the plaintiffs' recovery cannot be diminished by amounts paid by Medicare. Womack v. Travelers Insurance Company, 258 So.2d 562 (La.App. 1st Cir.1972), writ denied, 261 La. 775, 260 So.2d 701 (1972); Weir v. Gasper, 459 So.2d 655 (La.App. 4th Cir. 1984), writ denied 462 So.2d 650 (La. 1985)."
Williamson v. St. Francis Medical Center, 559 So.2d 929, 934 (La.App.2d Cir.1990).
Our review of the transcript removes any question that the hospital did, in fact, seek to introduce such evidence during cross-examination of plaintiffs' expert, Dr. Shelburne:
"Q You mentioned that during the examinationI think you said there was a certain standardized or plug-in procedure for long-term care of children with Adrien's condition. I think you said it was something you just sort of plug in, and I'm trying to refresh your memory
A I know what you'reI understand, and I think that's exactly what I said. There are certain needs that handicapped children with this degree of severity of problems have, and there's certain services that are generally utilized.
Q And in fact aren't these services generally provided by state and local and federal government"
Immediately after the recited colloquy, plaintiffs objected and a bench conference was held outside the presence of the jury. Defendants argued briefly that the line of inquiry was admissible because the Disabilities Education Act of 1990, 20 U.S.C. Sections 1400 and 1409, requires assistance for education of all handicapped individuals, but then agreed to withdraw the question to avoid confusion. Plaintiffs asked for a mistrial or, alternatively, instructions to the jury that they disregard the previous exchange. The trial court acceded to the wishes of the parties with the following words to the jury:
"THE COURT: Please be seated. Ladies and Gentlemen of the Jury, the last *476 question that was asked by Mr. Zuber was a question in which he asked, "In fact, aren't these services generally provided by state and federal government?"
Mr. Zuber has agreed to withdraw his question at this time, so I want you to disregard the question entirely. You are not to consider the question nor speculate as to what the answer might have been if this witness was allowed to answer the question. Does everybody understand?
THE JURORS: [Indicate "yes"].
THE COURT: Okay."
The trial judge declined to grant plaintiffs' motion for a mistrial on two grounds:
"THE COURT: The court is going to deny the motion for a mistrial, finding that the mere question was asked, but there was no answer in response to the question before the jury was removed, and that the court has admonished the jury not to speculate as to the answer to the question; so I feel that the plaintiffs are not prejudiced as a result of the asking of the question, and particularly in view of the admonition given to the jury by the court, and I will deny your motion and note for the record your objection to the ruling of the court."
We are unable to conclude that the trial judge erred in declining to order a new trial. The trial judge was in the best position to assess the prejudicial effect, if any, of the hospital's allusion to collateral benefits, and in the absence of clear abuse, the trial judge's sound discretion in denying a mistrial or new trial will not be disturbed on review, DeRosier v. South Louisiana Contractors, 583 So.2d 531, 538 (La.App. 3d Cir.), writ denied, 587 So.2d 700 (La.1991); Luquette v. Bouillion, 184 So.2d 766, 771 (La.App. 3d Cir.1966); Begnaud v. Texas & New Orleans Railroad Company, 136 So.2d 123, 129-130 (La.App. 3d Cir.1961), especially where, as here, there is "no actual evidence in the record" that might prejudice plaintiffs, Luquette, supra at 770, and the trial judge's error, if any, was harmless in light of all of the evidence presented.

CONCLUSION
In light of the foregoing, we affirm the judgment of the trial court and tax plaintiffs with the costs of these proceedings.
AFFIRMED.
DOUCET, J., concurs.
NOTES
[1] "Because in a bench trial the judge will often be able to evaluate the testimony of an expert without a significant risk of unfair prejudice, confusion of issues, etc., in applying this balancing test greater receptivity to expert testimony may properly be shown in a bench trial than in a jury case." Note 1, LSA-C.E. art. 702, citing Weinstein and Berger, supra, at ¶ 701[01], et seq.